SOUTHERN STATES COAL, IRON & LAND CO. *v.* GEO. S. MOORE & CO.

[Abstract Kentucky Law Reporter, Vol. 4—716.]

**Parol Proof to Vary Written Contract.**

While parol proof is not admissible to vary the terms of a written contract, where a mere memorandum is made and signed by one of the parties and is intended to evidence only the quantity and price, and not intended by the parties to contain the full terms of the contract, such a memorandum will not prevent extraneous testimony. Such a memorandum does not prevent the disclosure of what took place between the parties, nor is it conclusive of what the contract was.

**Facts Making Sale by Sample.**

Where the seller's agent takes the buyer to his office and exhibits to him samples of pig iron for the purpose of showing him how it is coming in, and the samples are afterwards sent to the buyer for the purpose of acquainting him with the quality of the iron, and these samples are taken by the buyer's yard men as specimens of what would constitute the bulk of a large quantity to arrive, and the samples were intended to control the agent of the seller, it is certain that the purchaser who knew nothing of the product must have been influenced to enter into the contract upon the assurance that the quality would average with the samples exhibited, and in such case it is held the sale was made by sample.

**Rights of Holder of Warehouse Receipt.**

Where one purchases iron by sample, the iron being stored in a warehouse, and receives assignment of a warehouse receipt and advances money thereon, and the iron is refused because not as good as the samples, the holder of such receipts may retain the same until his lien for money advanced is satisfied.

APPEAL FROM LOUISVILLE CHANCERY COURT.

February 1, 1883.

OPINION BY JUDGE PRYOR:

Hull & Co., who were the agents of the Southern States Coal, Iron & Land Co. (a Tennessee corporation), having its place of business at Pittsburg, Tennessee, sold for this corporation, as is alleged, to Geo. S. Moore & Co., one thousand tons of South Pittsburg No. 1 mill iron at the price of $22.50 per ton, to be delivered at Louisville within a reasonable time, in parcels to suit the convenience of the vendors. Hull, who made the contract, had his place of business in Louisville, and so did the vendees, Geo. S. Moore & Co., and both are dealers in pig iron. The contract was entered into on the 16th of July, 1880, as is evidenced by the sale memorandum made part of the record, and that seems to have been delivered to Moore & Co. on that day.

At the time the sale was made the appellant, the corporation, had a quantity of the South Pittsburg No. 1 mill iron, in the depot yard of the Louisville & Nashville R. Co., and on the 17th of July, the day following the contract, handed to appellees (Moore & Co.), an invoice of 202 254-1000 tons of South Pittsburg iron, which at the price agreed on amounted to $3,329.29. The money was paid to Hull & Co. by the appellees and the warehouse receipt delivered to them by Hull & Co. On the 23d of July warehouse receipts for 351 tons were delivered to the appellees and the money received by Hull & Co., amounting to $5,654.92. An invoice of 171 tons with warehouse receipts amounting to $3,089.83 was delivered to the appellees and the money paid and receipted for by Hull & Co. as agents of the appellants. On the 26th of August another invoice was made of 182 tons, and on the 31st of the same month the balance of the one thousand tons was invoiced and the invoice delivered, together with the warehouse receipts, to the appellees.

The appellees declined to advance any money on the invoices of the 26th and 31st of August until they could make an examination of the iron. The whole of the iron was in the yards of the Louisville & N. R. Co., and on the 7th of September the appellees made an examination of the iron and notified Hull & Co., the agents of the appellant, that the iron was of such inferior quality, weak, close, gray and mottled and not up to the samples, that in justice to themselves they would have to reject the entire lot. The agent, Hull, insisted that he had not sold by sample and that the iron was such as he had bound his principal to deliver, and this wide variance between the seller and buyer resulted in this litigation. The

appellees have paid in full for the three lots, as designated by invoices Nos. 1, 2 and 3, and have not paid for the two last, but held the warehouse receipts for all.

It is shown by the testimony in behalf of the appellants that the name, South Pittsburg No. 1 mill, is not, as understood by the trade, descriptive of the quality of the iron, that is, No. 1 mill iron, but is applied to iron that is the product of a particular furnace, and the brand is no criterion as to the quality, except such as the particular furnace produces. That is, the brand No. 1 mill iron, the product of this furnace, would not be considered as passable No. 2, made by another furnace. It is therefore established by the testimony that the iron delivered in Louisville was the product of the furnace having for its brand South Pittsburg No. 1 mill iron, and that the quality was as good and as uniform as the product of the furnace turning out South Pittsburg No. 1 mill.

It is insisted, however, by the appellees, that by the agreement the appellant was to deliver to them 1,000 tons of South Pittsburg No. 1 mill at Louisville, and that it was sold by sample, or if not by sample, that there was delivered to them two samples of the iron labelled South Pittsburg No. 1 mill that they might before purchasing know the average quality of the iron to be delivered. This the appellant denies, and it is the principal question in the case: Were samples delivered to the appellees by the agent of appellant for the purpose of evidencing the quality of the iron to be delivered under the purchase they were then attempting to make? The appellant says that no sample was delivered for that purpose, and if there had been this sale memorandum is the sole evidence of the contract between the parties.

1st. Was this a sale by sample as to the quality of the thing sold? Hull states upon being examined as a witness that he expressly stated at the time to one of the appellees who was examining the various specimens of iron that he would not sell by sample and that it must be so understood, and in this he is corroborated by another witness. He further says that he directed the yard man to send samples of all of his iron to Moore, and this is the manner in which Moore obtained the specimens. All this transpired the day before the contract was consummated. Moore, one of the appellees, states that Hull time and again urged him to go with him to his place of business to look at the samples, and that he

purchased the iron by the samples and the entire negotiation was conducted on that idea. It is also shown that Moore was unacquainted with the product or grades of iron made by the appellant, and it is unreasonable to suppose that he would make the purchase without having some knowledge of the character of iron he was to get. He says he wanted a No. 1 quality of mill iron and that the samples delivered him were labelled South Pittsburg No. 1 mill, the averaging quality of which was the iron he wished to purchase. As soon as Moore left the business house of Hull & Co. with the samples and on the same day, Hull telegraphed to the appellant that he could sell 1,000 tons of the iron but at a less price than the appellant was asking for it, and on the next day the contract was concluded and the sale memorandum made out by Hull & Co. and sent to the appellees, viz.:

"Sale memorandum.
  Sold to Geo. S. Moore & Co.
     for acct. of S. S. E. I. & L. Co.
        1,000 tons S. P. No. 1 mill at $20.50 cash
           in Louisville.     Very truly,
              S. S. C. I. & L. Co. by Geo. Hull & Co."

The appellees then had in their possession the two samples of the iron labelled South Pittsburg No. 1 mill, had never seen the quality of the iron produced by the appellant and knew nothing of its description or character except from the samples then in their possession. Hull in his cross-examination, while maintaining that there was no sale made by sample, says that he took Moore to his office and exhibited the samples for the purpose of showing him how the South Pittsburg was coming in, and he further states that the samples were sent to him for the purpose of acquainting him with the quality of the iron he was receiving and selling in the market, and these samples were taken by the yard men as specimens of what would constitute the bulk of a large quantity to arrive. If these samples were intended to control the agent of appellant, who is supposed to have been familiar with the various brands, etc., it is certain that the purchaser who knew nothing of the product or the particular brand must have been influenced to enter upon the contract upon the assurance that the quality would average with the samples exhibited, and we are therefore satisfied from the testimony that there was a sale by sample.

It is again insisted that the sale memorandum is conclusive be-
tween the parties as to what the contract was, and that parol
testimony will not be allowed to alter or add to its terms. The
general rule is, that when parties have reduced their contract to
writing no additional terms and conditions can be added to it by
extraneous evidence, and if this memorandum constitutes the en-
tire contract between the parties and was so intended at the time,
the evidence showing that it was a sale by sample was incompetent.
The question of intention when the contract is complete and found
in the writing can not control the action of the court in admitting or
refusing parol testimony unless there is an allegation of fraud or
mistake, and in the absence of such a defense the writing must
speak for itself.

The writing relied on in this case is a memorandum made out
and signed by the vendor or its agent, showing the quantity of
South Pittsburg No. 1 mill sold, and the price to be paid. When
or where the iron is to be delivered, whether in one bulk or in
parcels, is not stated, and the parties to the contract did not regard
it in any other light than as fixing the quantity sold and the price.
This action was not constituted on the contract, but an action
brought by the appellant in the nature of an action for goods sold
and delivered, and the memorandum exhibited for the first time by
the defendant in his examination as a witness during the progress
of the trial in the court below. When negotiations were entered
into with a view of making this purchase the samples were ex-
hibited to Moore, one of the firm, that he might know the quality
of the iron he was about to purchase. He was permitted to take
the two samples from the business house of Hull & Co. labelled
South Pittsburg No. 1 mill, that the members of his firm might
inspect them, and the next day with these samples in their pos-
session they purchased of the agent 1,000 tons of the iron. The
contract then was as Moore states it to be, 1,000 tons of iron equal
in the average quality to the samples held by them. The fact that
the samples were exhibited and delivered to the appellees the day
before the sale was made can make no difference. They were
delivered to and held by the appellees and constituted a part of the
contract with reference to the quality of the iron the moment it
was concluded. The memorandum made did not and was not
intended to exclude all the negotiations between the parties or to
evidence the full and complete contract between them. In the

amended petition it is alleged that by a subsequent contract the iron was to be delivered in instalments. It is evident that the entire quantity could not or was not in a condition to be delivered the next day, and a reasonable time should have been allowed the appellant (as was done) to comply with the contract. This all shows that the contract was an executory parol agreement and the memorandum made merely to show the price to be paid and the quantity to be delivered.

In the case of *Allen v. Pink,* 4 M. & W. 140, Allen purchased of Pink a horse, and the latter warranted the horse to work well in the harness. The defendant, Pink, gave to the vendee (Allen) a memorandum of the sale, as follows: "Bought of G. Pink, a horse for the sum of £7 2s. 6d. (Signed) G. Pink." In an action on the contract alleging a breach of the warranty it was insisted that the contract having been reduced to writing a parol warranty could not be added to it. The court held the action properly brought and said the memorandum was not intended to contain the terms of the contract. In the case of *Pitts v. Beckett,* 13 M. & W. 743, the same principle was assumed. In the case of *Miller v. Gaither,* 3 Bush (Ky.) 152, when there had been a written sale of a slave for the purpose of putting him in the army as a substitute for Miller, oral testimony was held competent to establish a warranty that the slave was suited for the purpose and that such a fact, when established, was not inconsistent with the bill of sale. While this may be extending the rule as far, at least, as the courts should go, it is certainly a much stronger case than where a mere memorandum is made and signed by one of the parties, intending to evidence only the quantity and price; and in these particulars it could not prevent extraneous testimony, if it was not intended by the parties as containing the full terms of the contract. The memorandum does not prevent the disclosure of what took place between them, nor is it conclusive evidence of what the contract was.

The court below, adjudging that the bulk of iron was inferior to the samples and that no title passed to the appellees as vendees, gave a judgment against the appellant for the money paid on the iron, with the interest, and this is assigned for error, the appellant insisting that the delivery of the warehouse receipts, and the payment of the money for the quantity mentioned in the invoices of July 17, July 23 and August 11, passed the title to the appellees, and their remedy, if they have any, is a recovery in damages by

reason of the breach. The money was paid in full for the quantity of iron mentioned in each of the three warehouse receipts first delivered, and a receipt executed by Hull for the money, and if there was nothing else in the case it would invest the appellees with title.

But Moore swears that the agent of the company wanted money for the company, and that he advanced the moneys as the invoices were delivered, taking the warehouse receipts as a lien to indemnify him until the entire bulk was delivered and the opportunity was afforded him of examining the iron. If the sale was by sample we see nothing inconsistent with this statement of Moore, but on the contrary it was reasonable that he should pay the money, reserving at the same time his right to reject the iron if it did not come up to the sample. This statement could not have been made by Moore with a view of relieving himself from a hard bargain. Iron was then advancing and he could have had no other motive than to have the contract complied with by the appellant. Besides, it appears that when this money was paid neither Hull, the agent, nor Moore had seen the iron, and that the money was paid under the conditions stated is entirely consistent with the facts of the case. The invoices were delivered with the warehouse receipts when neither Hull & Co. nor their clerks had seen the iron, but Hull assumed that the delivery would be in accordance with the contract. The appellant was wanting other advances than those made, and on the 21st of August the agent, Hull, wrote to his principal, saying that Geo. S. Moore & Co. wish to have the 1,000 tons delivered before making another settlement. This, we think, conduces strongly to sustain the statement made by Moore that he was to inspect the iron with the privilege of rejecting it before making payment in full. The action of Moore & Co. is entirely consistent during the period the appellant was delivering the iron in Louisville, assuming as this court has, from the facts, that the sale was by sample.

The testimony conduces to show that the greater part of the iron was inferior to the sample, and never having received the iron or any part of it under the contract, the right of the appellant to reject it had never been surrendered, and the examination made by the appellees as to the quality of the iron within a few days after the last lot was delivered must be held to be in a reasonable time, and therefore the judgment for the recovery of the money paid with the interest was proper. The counsel for appellant have

discussed much of this case upon the idea that the weight of the evidence is with the appellant. This case, although in equity, presents purely legal issues, and while there was an exception to the judgment on the motion to transfer the case from the common-law court, no objection was made to the motion and the case stands in that court as if brought originally in equity without a motion to transfer. We can not hold that the judgment below is flagrantly against the weight of the testimony, and without being able to do so no reversal can be had on the facts; and besides, we are inclined to the conclusion that the chancellor has adopted the court's view of the case if the weight of the testimony alone is to control it.

The remaining question arises as to the quantum of damages given the appellees by reason of the breach of the contract on the part of the appellant. If there was a failure to deliver such iron as was agreed upon by the contract the criterion of recovery is the difference between the price agreed to be paid and the price of the iron at the time the bulk of iron was ready for examination and inspection, or in other words ready for delivery, it being conceded that the iron was delivered in the yards of the railway company within a reasonable time. The amount of damages is fixed at fifteen hundred dollars.

It is claimed by the appellees and so adjudged by the court below that the iron was all properly rejected by the appellee for the reason that it was not of the quality sold, and that the appellees held a lien for the moneys advanced by reason of the warehouse receipts. The appellees, however, asserted a much larger claim by way of indemnity than the right of recovering the moneys advanced. They held the constructive possession of the iron by reason of the warehouse receipts. This gave them a lien for the money advanced, and when that was paid the appellant was entitled to the iron. It was appellant's property and held only subject to the lien. The appellees refused to deliver the receipts and so notified the appellant, unless the damages claimed by the appellees were also paid. They assessed the damages at a greater sum than the chancellor, and for months after the rejection of the iron they held on to the warehouse receipts, claiming a return of the purchase-money and damages. Not until about six months after the failure to comply with the contract by the appellant did they express a willingness to return the warehouse receipts on equitable grounds.

The iron was subject all this time to additional charges for storage, etc., and this was allowed the Louisville & N. R. Co. in the final adjustment of this controversy. This should have been deducted from the damages, as they were fully as much as the appellees were entitled to, less the additional storage caused by appellee's action. Whether the appellant lost by reason of a decline in the iron on account of the assertion of the claim to damages does not appear, or at least is not asked for by any pleading in the cause. On the return of the cause the appellant may be allowed to amend his pleading in this particular, and this question as to damages again considered. If additional pleadings are filed a judgment should be entered for the damages less the storage from the time the iron was rejected up to April 1, 1881, when appellees offered to restore the receipts, etc. The judgment is *reversed* as to the question of damages alone, the quantum to be ascertained as directed in the opinion, and the cause is remanded for further proceedings.

*Alex. P. Humphrey, R. & L. Buchanan, for appellant.*
*W. O. & J. L. Dodd, E. W. Hines, for appellees.*